United States District Court
Southern District of Texas
**ENTERED**
March 04, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| MATTHEW WIMBERLEY, ET AL., | § | |
| | § | |
| Plaintiffs. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:19-cv-00096 |
| | § | |
| BEAST ENERGY SERVICES, INC., ET AL., | § | |
| | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before me are two motions filed by Defendant Beast Energy Service, Inc. ("Beast Energy"): (1) a Motion for Summary Judgment (Dkt. 44); and (2) a Motion to Strike Plaintiffs' Summary Judgment Evidence (Dkt. 47). After carefully reviewing the motions, the parties' briefing, and the applicable law, and for the reasons discussed below, I recommend that Beast Energy's Motion for Summary Judgment and Motion to Strike be **DENIED**. I also *sua sponte* recommend Plaintiffs' claims against Defendant Stig Gjerlaug be **DISMISSED WITHOUT PREJUDICE** for failure to prosecute.

## FACTUAL BACKGROUND

Beast Energy is an oilfield service company that offers a range of downhole drilling tools and techniques, as well as other custom engineered products, solutions, and services (e.g., well-site supervision). Beast Energy employed Nicholas Flores ("Flores") and Matthew Wimberley ("Wimberley") (collectively "Plaintiffs") as service supervisors for approximately six months in 2018. Broadly speaking, Plaintiffs were responsible for loading and transporting oilfield service equipment to clients' well sites in south and west Texas, making sure the equipment was used in a safe manner, and returning the equipment to Beast Energy's shop in Rosharon, Texas. When Plaintiffs weren't traveling or onsite, they worked at Beast Energy's Rosharon shop, where they prepared, maintained, serviced, and rebuilt tools for upcoming jobs.

Plaintiffs received a monthly salary and were paid on a bi-weekly basis. In addition, Plaintiffs were eligible to receive bonus compensation known as "man-day" bonuses, which were calculated based on the number of projects Plaintiffs worked during the month prior, the fee Beast Energy charged its clients for said projects, and Beast Energy's overall profitability. The parties hotly dispute whether the man-day bonuses were discretionary.

Jason Tyson ("Tyson"), Plaintiffs' supervisor and Beast Energy's General Manager, maintains that he "had the authority on behalf of [Beast Energy] to offer" man-day bonus payments, which he verbally promised to Wimberley and Flores. *See* Dkt. 45-2 at 6–7. Plaintiffs similarly claim that Tyson, as well as Beast Energy's Vice President, Jason Hartley ("Hartley"), and its President/CEO, Stig Gjerlaug ("Gjerlaug"), verbally promised to pay them man-day bonuses. *See* Dkt. 45-4 at 7; Dkt. 45-5 at 7. Beast Energy disputes this characterization and maintains that, per Beast Energy's bonus policy, incentive bonuses were discretionary and largely dependent upon the company's overall profitability. *See* Dkt. 44-1 at 4, 8–9. Whatever the case, Beast Energy did not prove to be profitable, and in November 2018, Plaintiffs, along with Tyson, resigned.

In March 2019, Plaintiffs sued Beast Energy and Gjerlaug to recover unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. Despite filing this suit nearly three years ago, Beast Energy never served Gjerlaug with process. Accordingly, I *sua sponte* recommend the Court dismiss Plaintiffs' claims against Gjerlaug without prejudice for failure to prosecute. *See* FED. R. CIV. P. 4(m).

In their Second Amended Complaint, Plaintiffs complain they never received overtime compensation, despite "regularly . . . work[ing] in excess of forty (40) hours per week[,] generally working approximately sixty (60) to one hundred and twenty (120) hours per week or more." Dkt. 14 at 4. Plaintiffs also argue that the man-day bonuses they received or are owed should be considered part of their regular rate of pay for purposes of calculating their unpaid overtime.

Beast Energy has moved for summary judgment. Leading off, Beast Energy argues that Plaintiffs are not entitled to overtime compensation because they were

properly classified as exempt administrative employees. In the alternative, Beast Energy argues that Plaintiffs have failed to satisfy their burden of demonstrating they performed compensable overtime work because the hours they claim to have worked are either "physically impossible" or include non-compensable "travel time." Dkt. 44 at 27. Finally, and again in the alternative, Beast Energy argues that the man-day bonuses were discretionary and, therefore, should not be included as part of Plaintiffs' regular rate of pay.

In response, Plaintiffs argue that the administrative exemption does not apply because they performed manual labor and their "primary duty" was not directly related to Beast Energy's management or general business operations. Plaintiffs also dispute that the man-day bonuses were discretionary. As for the credibility of their claimed overtime hours, Plaintiffs argue that is a fact question for the jury to decide. Regardless, Plaintiffs argue, time spent transporting necessary equipment to and from well sites is compensable under the FLSA.

## LEGAL STANDARD

### A.   SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *See Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834, 837 (S.D. Tex. 2017). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once satisfied, the burden shifts to the nonmovant to show the existence of a genuine fact issue for trial. *See id.* at 324. To do so, the "nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015).

In ruling on a motion for summary judgment, I must construe "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020). It is

not my role to weigh the evidence or evaluate its credibility, as those are fact questions for the jury to decide. *See Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (holding that a district court makes an improper credibility determination when it weighs the evidence or chooses which testimony to credit and which to discard). That said, I am "not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence." *Id.* (quotation omitted).

**B.    THE FLSA'S OVERTIME REQUIREMENT AND THE ADMINISTRATIVE EXEMPTION**

Under the FLSA, employers must pay overtime compensation to employees who work more than 40 hours per week. *See* 29 U.S.C. § 207(a)(1). However, employees working in a bona fide executive, administrative, or professional capacity are exempt from the FLSA's overtime requirement. *See* 29 C.F.R. § 541.200(a). Only the administrative exemption is at issue in this case. An employee qualifies as an administrative employee if:

(1)   He is compensated on a salary or fee basis at a rate of not less than $455[1] per week;

(2)   His primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3)   His primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

*See id.*

The employer has the burden of establishing that an exemption applies by a preponderance of the evidence. *See Fraser v. Patrick O'Connor & Assocs., L.P.*, 954 F.3d 742, 745 (5th Cir. 2020). The Supreme Court has rejected the principle that the FLSA's exemptions should be construed narrowly against the employer and instead determined courts must give them a "fair reading." *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) ("Because the FLSA gives no textual indication

---

[1] Section 541.200(a)(1) was amended, effective January 1, 2020, to increase the minimum applicable weekly salary from $455 per week to $684 per week. *See* 29 C.F.R. § 541.200(a)(1). The current regulation differs in no other material way from the version in effect at the time Plaintiffs filed the underlying lawsuit.

that its exemptions should be construed narrowly, there is no reason to give them anything other than a fair (rather than a narrow) interpretation." (cleaned up)).

## ANALYSIS

### A.   OBJECTIONS TO PLAINTIFFS' SUMMARY JUDGMENT EVIDENCE

Because the disposition of Beast Energy's Motion to Strike will affect the evidentiary record, I address it first.

In opposition to Beast Energy's Motion for Summary Judgment, Plaintiffs submitted the sworn declarations of Tyson, Wimberley, and Flores. Beast Energy asserts a general objection to "[a]ny statements . . . that are not based on the declarant's personal knowledge." Dkt. 47 at 4. Beast Energy also objects to and has moved to strike specific portions of the declarations, arguing the testimony is conclusory, "calls for an ultimate legal conclusion," or "contains a factual allegation that is actually an ultimate legal conclusion." *See id.* at 2–7.

Under Federal Rule of Civil Procedure 56, declarations may be offered in support of, or opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence. *See* FED. R. CIV. P. 56(c)(4). *See also* FED. R. EVID. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). However, the factual averments cannot be conclusory or based on mere belief. *See Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997). If a declarant establishes personal knowledge of the facts contained in their declaration, questions concerning whether the statements are true or whether a declarant is misrepresenting facts are not for the court to address at summary judgment, as that is obviously an issue of credibility.

### 1.   *General Objection to the Declarants' Testimony*

I begin with Beast Energy's global objection to "[a]ny statements . . . that are not based on the declarant's personal knowledge." Dkt. 47 at 4. Federal Rule of Evidence 103(a)(1) requires an objecting party to make specific objections detailing the specific evidence the party wishes to have stricken and stating the specific grounds upon which each piece of evidence should be stricken. *See* FED. R. EVID. 103(a)(1). *See*

*also* FED. R. CIV. P. 7(b)(1)(B) (requiring all motions "state with particularity the grounds for seeking the order"). Objections lacking specificity do not satisfy the requirements of Rule 103. *See United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998). Without question, Beast Energy's generalized objection to statements that are not based on the declarants' personal knowledge does not meet this standard. *See, e.g.*, *Watts v. L-3 Commc'ns Corp.*, No. 3:12-CV-4248-G, 2013 WL 3789868, at *5 (N.D. Tex. July 22, 2013) (overruling an objection to an affidavit for failing to specify the portions of the affidavit to which it refers); *Payne v. Collins*, 986 F. Supp. 1036, 1057 (E.D. Tex. 1997) (same).

### 2. *Specific Objections to the Declarants' Testimony*

The declarations at issue are practically identical. With the exception of one stray objection,[2] Beast Energy objects to the same portions of each:

- "[Plaintiffs'] primary duty during [their] employment with [Beast Energy] was ***not*** the performance of office or non-manual work directly related to the management or general business operations of [Beast Energy] or [its] customers. Wimberley's and Flores' primary employment duty with [Beast Energy] was non-management 'blue-collar' manual labor production service work involving repetitive operations with our hands, physical skill and energy . . . ."

- "The primary duty of Wimberley and Flores . . . was producing the very services (oil and gas well services for [Beast Energy's] customers and clients through the delivery and operation of oilfield equipment) that [Beast Energy] as an enterprise existed to produce and market to the public and its customers for profit . . . ."

- "[Plaintiffs'] travel activity driving the pickup truck as a necessary tool/equipment [sic] from the hotel to the well site was an integral and indispensable part of the principal activities for which we were employed, well[-]service work."

---

[2] Beast Energy objects to Wimberly's statement that "[o]versight of the health and safety affairs of Beast [Energy] was not Wimberley's nor Flores' primary duty while employed with Beast [Energy]" on the grounds that it is conclusory and calls for an ultimate legal conclusion. Dkt. 47 at 7. Beast Energy does not object to the exact same sentence in Flores' declaration, *see* Dkt. 45-3 at 3, nor does it object to Tyson's testimony to that effect. *See* Dkt. 45-2 at 3–4. Regardless, for the reasons explained in this section, I recommend that Beast Energy's objection be overruled.

- "While [Beast Energy] had some discretion over the fact of the payment, [Beast Energy] did not have discretion over the amount of the bonuses. The amount and predetermined formula/calculation of the bonuses was not discretionary."[3]

Dkt. 47 at 6–8.

Although not precisely stated as such, Beast Energy principally takes issue with the declarants' characterization of Plaintiffs' primary duty as blue-collar work that was not directly related to Beast Energy's management or general business operations, as that language tracks the legal standard used to determine whether the administrative exemption applies. In response, Plaintiffs argue that the declarants' use of the term "primary" was meant to convey Plaintiffs' "main" or "dominant" responsibilities, not their legal opinions or conclusions. *See* Dkt. 54 at 3, 8, 15.

Each declaration is sworn under the penalty of perjury and provides that the declarant has personal knowledge of those facts contained therein. Though the declarations themselves are practically identical, the declarants' testimony appears to be grounded in personal observation or experience. In large part, the declarants' testimony concerns Plaintiffs' day-to-day activities or responsibilities. Plaintiffs certainly have first-hand knowledge of this subject, as would Tyson, who, as Plaintiffs' supervisor, "had the authority to assign [Plaintiffs] specific job duties and monitor their work activities." Dkt. 45-2 at 1.

A district court in the Western District of Texas recently confronted a "legal conclusion" objection to a similar, albeit not quite as perfunctory, declaration regarding an employee's "primary" employment duty. *See Mondeck v. LineQuest, LLC*, No. MO:19-CV-00221-DC-RCG, 2021 U.S. Dist. LEXIS 218584, at *5 (W.D. Tex. Aug. 3, 2021). There, the district court concluded that "despite the term 'primary duty' being a legal conclusion in some circumstances, when viewed as part of [the plaintiff's] entire declaration, rather than an isolated statement, it is clear he [was] using the term in its plain, everyday meaning, not as a legal conclusion." *Id*. I cannot say with equal

---

[3] I note that Beast Energy is guilty of the same sin of which it accuses the declarants, as Gjerlaug testified by declaration that the man-day bonuses "[are], and always ha[ve] been, discretionary." Dkt. 44-1 at 4.

conviction that the declarants' repeated use of the term "primary duty" or its equivalent was strictly meant in the colloquial sense. Nonetheless, the testimony provides adequate factual details to flesh out the responsibilities each declarant alleges Plaintiffs performed while working at Beast Energy.

Accordingly, I recommend the Court deny Beast Energy's Motion to Strike.

## B.   ADMINISTRATIVE EXEMPTION

The parties agree that Plaintiffs satisfy the administrative exemption's weekly salary requirement. Their dispute centers on whether Beast Energy has satisfied the second and third administrative-exemption requirements concerning Plaintiffs' "primary duty." Thus, I must address whether there is a triable issue of fact as to whether Plaintiffs' primary duty was "the performance of office or non-manual work directly related to [Beast Energy's] management or general business operations" (the second requirement) and "includes the exercise of discretion and independent judgment with respect to matters of significance" (the third requirement). *See* 29 C.F.R. § 541.200(a).

### 1.   *Performance of Office or Non-Manual Work Directly Related to the Management or General Business Operations of Beast Energy or its Customers (the second requirement)*

As noted, the second prong of the administrative exemption requires Beast Energy to establish that Plaintiffs' primary duty was "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2).

Beast Energy does not dispute that Plaintiffs performed manual work but argues that Plaintiffs' "primary job duties were [non-manual work] directly related to the management or general business operations of Beast Energy and its customers." Dkt. 46 at 3. Plaintiffs flatly reject the notion that their primary duty was non-manual in nature, insisting instead that their primary duty was producing the commodity— well-site services through the delivery and operation of oilfield equipment—that Beast Energy, as an enterprise, existed to produce and market to the public.

The regulations governing the administrative exemption distinguish between employees whose primary duty is administering the business affairs of the enterprise

and those whose primary duty is producing the commodity or commodities—whether goods or services—that the enterprise produces and markets. *See* 29 C.F.R. § 541.201(a); *Fraser*, 954 F.3d at 746. This conceptual distinction is commonly referred to as the "administration-production dichotomy." *Pye v. Oil States Energy Servs., LLC*, 233 F. Supp. 3d 541, 560 (W.D. Tex. 2016). Simply stated, production employees whose job it is to generate the product or service the business offers to the public will not qualify for the administrative exemption.

Admittedly, "the line between administrative and production jobs is not a clear one, particularly given that the item being produced is often an intangible service rather than a material good." *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 336 (5th Cir. 2017) (cleaned up). The line blurs even further in cases like this, as workers in the oil-and-gas industry are particularly difficult to classify. *See Guyton v. Legacy Pressure Control*, 5:15-CV-1075-RCL, 2017 WL 244868, at *3–4 (W.D. Tex. Jan. 18, 2017) (observing that "[c]ourts in this Circuit have considered whether various types of oil field operators or inspectors qualify as manual or blue[-]collar workers" and "reached different conclusions" (collecting cases)). Nonetheless, "[a]lthough the administrative-production dichotomy is an imperfect analytical tool in a service-oriented employment context, it is still a useful construct." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 694 (4th Cir. 2009).

Beast Energy takes the position that the administrative-production dichotomy "has limited, if any, application" in this case because Beast Energy "provides services rather than produces goods." Dkt. 46 at 5. However, as mentioned, production can mean a business's products or services. *See Fraser*, 954 F.3d at 746. Here, the evidence demonstrates that Plaintiffs worked to produce the very services Beast Energy offers—the delivery and operation of oilfield equipment at Beast Energy's customers' well sites. *See Pye*, 233 F. Supp. 3d at 560–61 ("Instead of running [Beast Energy's] business or influencing in its overall course or policies, [Plaintiffs] generated the service [Beast Energy] offered to the public.").

But even assuming Beast Energy is correct, *see id.* at 560 ("The administrative/production dichotomy has only been determinative when the work

falls squarely on the production side of the line." (quotation omitted)), it still has not established that Plaintiffs' primary duty was directly related to the management of its general business operations or that of its customers.

The regulations provide a non-exhaustive list of exempt administrative activities, including employees who "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; . . . [and] legal and regulatory compliance." 29 C.F.R. § 541.201(b). Beast Energy focuses on Plaintiffs' purported safety-related responsibilities.

First, it contends that Plaintiffs' primary duties "included assisting in making sure that Beast Energy conducted its operations in a safe manner and in compliance with all applicable health and safety regulations." Dkt. 44 at 19. In support, Beast Energy cites what appears to be onboarding paperwork, signed by Plaintiffs, in which they acknowledged their "right and responsibility to refuse unsafe work and to question [their] supervisor about a job [they] believe to be unsafe or unnecessarily dangerous." Dkt. 44-12 (emphasis omitted); Dkt. 44-13 (emphasis omitted). Beast Energy also points to culled portions of Plaintiffs' deposition testimony, in which they each generally testified that one of their onsite responsibilities was to advise workers of potential or actual hazards at the well site. However, a cursory review of the evidence makes clear that any safety-related responsibilities were ancillary to Plaintiffs' primary duty.[4]

_____

[4] Beast Energy also argues that Plaintiffs' declarations ignore or contradict their prior deposition testimony regarding their safety-related duties. *See* Dkt. 46 at 5. As proof, Beast Energy cites a whopping eight lines of deposition testimony—four from each Plaintiff's deposition:

> Q:   And given the location, it's my understanding that safety and especially safety compliance are very important for the operations of these wells, would you agree?
>
> A:   [Flores] Yes, ma'am.

Dkt. 44-3 at 11.

> Q:   And so in your work in the oil field, am I -- safety is key -- an important factor in your work every day, isn't it?

In what is essentially an offshoot of its safety-related arguments, Beast Energy also claims that "Plaintiffs' job duties entailed advising and consulting Beast Energy client [sic] on how to resolve certain operations issues that would arise at the wellsite . . . and recommend how best to respond to and resolve these issues." Dkt. 44 at 19. From there, Beast Energy conclusively proclaims: "Thus, by Plaintiffs' own admissions, their primary work duties were directly related to the management or general [sic] business operations of Beast Energy." *Id.* at 19–20 (quotation omitted). Beast Energy waited until its reply brief to elaborate further:

> Specifically, the evidence demonstrates that Plaintiffs' primary duties consisted of managing Beast Energy's downhole operations at its customers' well sites, which involved interacting with customers and other contractors at the jobsite, providing onsite advice and counsel to clients on how to resolve downhole operations issues at the wellsite, and ensuring that they and other service providers were working at the well in a safe and compliant manner.

Dkt. 46 at 3. This summary reformation of Plaintiffs' deposition testimony is artful yet unpersuasive, as it ignores the fact that Plaintiffs spent most of their time loading equipment, traveling, setting up equipment, operating equipment, and taking down equipment—duties that are manual in nature. *See Pye*, 233 F. Supp. 3d at 559 (finding no genuine issue of material fact that an oilfield service supervisor's primary duties—which are similar to Plaintiffs' in this case—"were the performance of manual work"). It also conveniently overlooks portions of Plaintiffs' testimony to that effect:

> Q:    We've talked about here with your duties, we have gone over rebuilding tools, we've done hot shots, running through tubing tools, running fishing tools and we've talked about your driving. Were there any other duties that you performed while you were employed with Beast Energy?
>
> A:    [Flores] No, that was -- that was really it. Pretty much the grunt work of everything.

Dkt. 44-3 at 13.

> Q:    And so your -- your duties were strictly to -- related with going and loading and unloading tools at the shop, driving to a well site, and

---

> A:    [Wimberley] Yes.

Dkt. 44-2 at 12.

> putting different tools down a -- down a well site for a client to clean them out. What other purposes were for you to put the tools down the hole?

A:      [Wimberley] Fishing. Fishing and cleaning out is pretty much it.

***

Q:      Is there anything else you guys would do on a well site?

A:      [Wimberley] Not that I can think of, no.

Dkt. 44-2 at 19.

Based on my review of the summary-judgment record, I conclude that Beast Energy has failed to meet its burden of demonstrating that Plaintiffs' primary duty was the performance of office or non-manual work directly related to its management or general business operations. This, alone, is fatal to its Motion for Summary Judgment.

### 2. Exercise of Discretion and Independent Judgment (the third requirement)

Even if Beast Energy had carried its burden on the administrative exemption's second prong, I find that a fact issue regarding whether Plaintiffs' primary duty included the exercise of discretion and independent judgment (the third prong) precludes summary judgment.

Generally, the exercise of discretion and independent judgment involves the comparison and evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. *See Pye*, 233 F. Supp. 3d at 561. An employee need not exercise final decision-making authority to meet this standard. *See id*. Nevertheless, the exercise of discretion requires "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. 541.202(e).

Plaintiffs testified at deposition that they applied their knowledge and understanding of downhole operations, fishing techniques, and tools and equipment to determine how best to perform their jobs and prevent or remedy issues at the well site. To hear Beast Energy tell it, "[t]his is precisely the kind of discretion and independent judgment that satisfies the final element of the administrative exemption." Dkt. 44 at 21.

Aside from its high-level argument that Plaintiffs applied their experience and knowledge at the well site to determine how best to perform their jobs, Beast Energy has not convinced me that Plaintiffs exercised sufficient discretion and independent judgment to fall within the administrative exemption. While some of Plaintiffs' duties suggest that they exercised discretion and independent judgment, a fact question remains as to whether Plaintiffs exercised sufficient discretion and independent judgment in carrying out their duties to conclude, as a matter of law, that Beast Energy has carried its burden on the administrative exemption's third factor.

Based on the evidence put forth by Beast Energy, and for the reasons explained above, Beast Energy has failed to prove by a preponderance of the evidence that Plaintiffs were administrative employees. Accordingly, I recommend summary judgment on this issue be denied.

## C.  FLSA OVERTIME COMPENSATION

### 1.  *The FLSA's Burden-Shifting Framework*

An employee bringing an FLSA claim based on unpaid overtime compensation must first demonstrate that he has performed work for which he alleges he was not compensated. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946). This can prove difficult where, as here, the employer does not keep complete and accurate records of an employee's hours. *See Von Friewalde v. Boeing Aero. Operations, Inc.*, 339 F. App'x 448, 455 (5th Cir. 2009). When that is the case, the solution is not to penalize the employee by denying him any recovery on the ground that he cannot prove the precise extent of uncompensated work. *See Mt. Clemens*, 328 U.S. at 687. Instead, an employee satisfies his requisite burden of proof if he proves that he has performed work for which he was improperly compensated and produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. *See id.*

The evidence of hours worked need not be perfectly accurate and will suffice as long as it provides a sufficient basis to calculate the number of hours worked. *See Marshall v. Mammas Fried Chicken, Inc.*, 590 F.2d 598, 599 (5th Cir. 1979). Under this standard, courts may draw inferences from oral testimony, sworn declarations,

and any other relevant documentary evidence produced by the plaintiff. *See Mohammad v. Nwabuisi*, 990 F. Supp. 2d 723, 739–40 (W.D. Tex. 2014). The evidence may be anecdotal and imprecise, but mere assertions will not suffice. *See Harvill v. Westward Commc'ns L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005). If the employee carries his burden, the employer must come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference drawn from the employee's activities. *See Mt. Clemens*, 328 U.S. 687–88.

### 2. Plaintiffs' Claimed Number of Hours Worked

Plaintiffs have undoubtedly presented evidence that they worked more than 40 hours in a given workweek for which they were not paid overtime. However, some of Plaintiffs' weekly calculations seem incredibly unlikely, while others border on the impossible. Below, I've included a breakdown of the weekly hours Plaintiffs claim to have worked in 2018.[5]

| Flores | | | |
|---|---|---|---|
| Pay Period | Alleged Regular Hours Worked | Alleged Overtime Hours Worked | Total Alleged Hours Worked |
| April 22 – April 28 | 40 | 115 | 155 |
| April 29 – May 5 | 40 | 52 | 92 |
| May 6 – May 12 | 40 | 110 | 150 |
| May 13 – May 19 | 40 | 14 | 54 |
| May 20 – May 26 | 40 | 4 | 44 |
| May 27 – June 2 | 40 | 89 | 129 |
| June 3 – June 9 | 40 | 53 | 93 |
| June 10 – June 16 | 40 | 4 | 44 |
| June 17 – June 23 | 40 | 5 | 45 |
| June 24 – June 30 | 40 | 57 | 97 |
| July 1 – July 7 | 40 | 12 | 52 |

[5] Dkt. 44-19 at 9–10 (Flores); Dkt. 44-20 at 9–10 (Wimberley).

| July 8 – July 14 | 40 | 40 | 80 |
|---|---|---|---|
| July 15 – July 21 | 40 | 39 | 79 |
| July 22 – July 28 | 40 | 33 | 73 |
| July 29 – Aug. 4 | 40 | 46 | 86 |
| Aug. 5 – Aug. 11 | 40 | 20 | 60 |
| Aug. 12 – Aug. 18 | 40 | 20 | 60 |
| Aug. 19 – Aug. 25 | 40 | 4 | 44 |
| Aug. 26 – Sept. 1 | 40 | 62 | 102 |
| Sept. 2 – Sept. 8 | 40 | 128 | 168 |
| Sept. 9 – Sept. 15 | 40 | 34 | 74 |
| Sept. 16 – Sept. 22 | 40 | 22 | 62 |
| Sept. 23 – Sept. 29 | 40 | 33 | 73 |
| Sept. 30 – Oct. 6 | Less than 40 | -- | -- |
| Oct. 7 – Oct. 13 | Less than 40 | -- | -- |
| Oct. 14 – Oct. 20 | 40 | 1 | 41 |

| Wimberley | | | |
|---|---|---|---|
| Pay Period | Alleged Regular Hours Worked | Alleged Overtime Hours Worked | Total Alleged Hours Worked |
| April 29 – May 5 | Less than 40 | -- | -- |
| May 6 – May 12 | 40 | 3 | 43 |
| May 13 – May 19 | 40 | 37 | 77 |
| May 20 – May 26 | 40 | 5 | 45 |
| May 27 – June 2 | 40 | 15 | 55 |
| June 3 – June 9 | 40 | 31 | 71 |
| June 10 – June 16 | 40 | 4 | 44 |
| June 17 – June 23 | 40 | 5 | 45 |
| June 24 – June 30 | 40 | 4 | 44 |
| July 1 – July 7 | 40 | 4 | 44 |

| July 8 – July 14 | 40 | 53 | 93 |
| July 15 – July 21 | 40 | 20 | 60 |
| July 22 – July 28 | 40 | 40 | 80 |
| July 29 – Aug. 4 | 40 | 3 | 43 |
| Aug. 5 – Aug. 11 | 40 | 20 | 60 |
| Aug. 12 – Aug. 18 | 40 | 20 | 60 |
| Aug. 19 – Aug. 25 | 40 | 4 | 44 |
| Aug. 26 – Sept. 1 | Less than 40 | -- | -- |
| Sept. 2 – Sept. 8 | 40 | 44 | 84 |
| Sept. 9 – Sept. 15 | 40 | 11 | 51 |
| Sept. 16 – Sept. 22 | 40 | 15 | 55 |
| Sept. 23 – Sept. 29 | 40 | 46 | 86 |

Beast Energy vehemently argues that Plaintiffs have failed to carry their burden for "much of the overtime they claim they are owed" since their "calculations are based on work hours that are physically impossible and include significant amounts of time that are unaccounted for or not compensable as a matter of law." Dkt. 44 at 25. Accordingly, Beast Energy asks me to either throw Plaintiffs' case out or, if I determine Plaintiffs are entitled to unpaid overtime pay, "reduce the amounts [Plaintiffs] can seek accordingly." *Id.* Plaintiffs have done next to nothing to combat Beast Energy's argument; instead, they simply claim that the number of hours worked is a fact question for the jury. Despite Plaintiffs' near-fatal lack of effort, for the reasons explained below, I recommend summary judgment be denied on this issue.

First, let me set the stage. The record contains field tickets, which are essentially itemized bills for each project. One of the items listed on each field ticket is the Beast Energy employee(s) who worked on the project. Next to each of their names, the field tickets identify the date(s) each employee worked and indicate whether that employee worked "AM," "PM," or "AM/PM." Day-rate logs, which accompany some field tickets, suggest that employees worked 12-hour shifts—hence, "AM" and "PM." However, the parties agree that field tickets do not accurately reflect the number of hours an employee worked in a given shift.

16

Unfortunately, in this instance, "agree" is a bit of a misnomer. Plaintiffs argue that field tickets are a good indicator of their time spent working on a particular project but claim they regularly worked shifts in excess of 12 hours. Beast Energy, on the other hand, takes the position that field tickets are only relevant to the extent they confirm that an employee worked on a project and the date(s) on which he worked. As for the day-rate logs' reference to 12-hour shifts, Beast Energy explains that it billed clients on a full- or half-day basis, which were broken down into 12-hour increments. In other words, references to 12-hour shifts (or "AM" and "PM") only reflect whether Beast Energy charged its client a full- or half-day rate.

### a. Wimberley

This one is a relatively easy call. Wimberley's overtime calculations, coupled with his testimony, provide a sufficient basis for him to withstand summary judgment. At deposition, he offered a plausible explanation for his calculations based on the field tickets and his recollection. Moreover, his claimed overtime is not egregious, given the industry in which he works.

### b. Flores

The proverbial thorn in my side is Flores.

A large portion of Flores' field tickets suggest that he worked both the "AM" and "PM" shifts for at least *some* of the days covered by that particular field ticket. *See* Dkt. 44-9 at 2, 4–8, 10, 13–15; Dkt. 44-10 at 2, 8–9, 11–13; Dkt. 44-11 at 2–3, 6–7, 10–11. Some field tickets even suggest that Flores exclusively worked both the "AM" and "PM" shifts for that project. *See, e.g.,* Dkt. 44-9 at 5–8. Moreover, at least some of Flores' purported back-to-back 12-hour shifts line up with the weeks he claims to have worked an enormous number of hours. *See, e.g., id.* at 2–3 (covering the week of April 22 – April 28), 6–10 (covering the week of May 6 – May 12).

The field tickets, however, are a double-edged sword. For example, no field ticket indicates Flores worked at a well site on April 22 or May 6, which begs the question: How is it possible Flores worked 155 and 150 hours during those workweeks when a six-day period is only 144 hours? Not to mention, if someone were to work 144 hours in a single workweek, that would leave, on average, less than 3.5 hours each day

to sleep—and that is assuming the employee in this hypothetical only worked and slept. These are just a few of the logical holes one can poke in Flores' weekly calculations.

That said, when challenged at deposition, Flores stuck to his guns. He excused discrepancies between the field tickets and his calculations by explaining that he would regularly work more than 12 hours each day and, on top of that time, often spent between one and four hours rigging up or breaking down equipment in the field. He also testified that the well sites were hundreds of miles away, in south and west Texas. So, Flores explained, time spent traveling between projects could account for a fairly sizable portion of his claimed overtime.[6]

---

[6] Beast Energy asks me to decide whether the following travel time is compensable under the FLSA—time Plaintiffs spent traveling between: (1) Beast Energy's shop in Rosharon and the well site; or (2) their hotel and the well site when working on location. *See* Dkt. 44 at 27. The latter is not compensable, while a fact question exists regarding the former. Here, the key takeaway is that, on the days that Plaintiffs drove a company-owned truck or trailer from the shop in Rosharon to a client's well site, Plaintiffs claim that they were tasked with gathering and transporting supplies and equipment necessary to perform their job. If true, Plaintiffs' travel time was likely an integral and indispensable part of their principal responsibilities and, therefore, compensable under the FLSA. *See, e.g., Pittard v. Red River Oilfield Servs., LLC*, No. 4:15-CV-3753, 2017 WL 6498336, at *3 (S.D. Tex. Dec. 15, 2017) ("The time [Plaintiffs] spent completing these activities and the drive time from the company shop to the jobsite are compensable under the Portal-to-Portal Act because those hours are integral and indispensable to [Plaintiffs'] job . . . . Even though the activities performed at the company shop are not part of Plaintiff's principal responsibilities, without the trailer and the other supplies and equipment, [Plaintiffs] . . . would not be able to perform their duties at the jobsite."). *See also Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345, 1350 (10th Cir. 1986) (holding "time spent travelling to and from drill sites" was compensable where workers carried special equipment for servicing oil rigs); *D A & S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 555 (10th Cir. 1958) ("employees who transport equipment without which well servicing could not be done, are performing an activity which is so closely related to the work which they and the other employees perform, that it must be considered an integral and indispensable part of their principal activities"). But regardless of whether travel time *to* the well site is compensable, based on the record before me, it is unclear whether time spent traveling home to Rosharon at the conclusion of a project is compensable as an integral and indispensable part of Plaintiffs' principal responsibilities. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, FLSA2020-16, 2020 WL 6542038, at *3 (Nov. 3, 2020) ("The laborers' travel to and from the remote location at the beginning and end of the job, on the other hand, *may* or *may not* be compensable." (emphasis added)). *See generally Burton v. Hillsborough Cnty.*, 181 F. App'x 829, 835 (11th Cir. 2006) ("Thus, if an employee driving an employer-owned car is *required* to return to the employer's premises after a day's work prior to returning home, that time is compensable under the FLSA.").

The elephant in the room is Flores' herculean 168-hour workweek (Sept. 2 – Sept. 8). For perspective, there are only 168 hours in a week. At deposition, Flores testified that he did not sleep, did not take a single meal break, and never left the well site; however, he later walked his claim back a bit, testifying that he worked half-day shifts on September 4 and 5. This is at least arguably consistent with the field ticket for that project, which shows he worked both the "AM" and "PM" shifts on September 2 and 3 and the "AM" shift on September 4 and 5. *See* Dkt. 44-11 at 3. But the field tickets covering the remainder of that workweek reflect that Flores only worked the "AM" shift on September 6, 7, and 8. *See id.* at 5, 7. What's more, field tickets for two different projects indicate Flores worked the "AM" shift on September 7. *See id.*

But recall, field tickets are not precise records of Plaintiffs' time. And evidence of hours worked need not be "perfectly accurate" as long as it provides "a sufficient basis to calculate the number of hours worked by each employee." *Marshall*, 590 F.2d at 598. Beast Energy cites *Ihegword v. Harris County Hospital District* for the proposition that "an unsubstantiated and speculative estimate of uncompensated overtime does not constitute evidence sufficient to show the amount and extent of that work as a matter of just and reasonable inference." 929 F. Supp. 2d 635, 668 (S.D. Tex. 2013). However, *Ihegword* is distinguishable, as the employer in that case maintained records of the hours its employees worked. *See id.* Here, "[b]ecause precise evidence of the hours worked by each individual is not available due to the failure of [Beast Energy] to keep adequate records, [Plaintiffs] may satisfy their burden with admittedly inexact or approximate evidence." *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1330–31 (5th Cir. 1985). *See also Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 725–26 (5th Cir. 1961) (explaining that an employer "cannot really complain that matters are left in great uncertainty" due to its own failure to keep accurate time and wage records). Numerous FLSA cases hold an employee's own testimony regarding his hours can establish a "just and reasonable inference." *See, e.g., Beliz*, 765 at 1330–31; *Donovan v. Hamm's Drive Inn*, 661 F.2d 316, 318 (5th Cir. 1981); *O'Meara-Sterling v. Mitchell*, 299 F.2d 401, 403–04 (5th Cir.

1962). Though a close call, I find that Flores has provided a sufficient basis for his claimed overtime, the credibility of which is not before me at this time.

Once an employee proves the claimed hours worked by just and reasonable inference, the burden shifts to the employer to "disprove the employee's testimony that the [FLSA] was violated." *Beliz*, 765 F.2d at 1330 (quotation omitted). To do so, the employer must come forward with *evidence* to negate the reasonableness of the inference to be drawn from the employee's prima facie case. *See Mt. Clemens*, 328 U.S. 687–88. Here, Beast Energy has not provided any *evidence*—such as the sworn testimony of its clients, whose employees regularly worked alongside Plaintiffs at the well site—to refute Plaintiffs' claimed hours worked. In fact, even though Wimberley and Flores frequently worked on the same projects, it does not appear that Beast Energy's counsel asked either of them about the other's claimed hours at their respective depositions. At best, Beast Energy has pointed to the field tickets as contradictory evidence. But at summary judgment, I am required to view "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Cadena*, 946 F.3d at 723.

Construing the evidence in the light most favorable to Plaintiffs, I find that a genuine issue of material fact exists as to whether Plaintiffs are entitled to overtime compensation and, if so, the number of overtime hours Plaintiffs worked. *See Carman v. Meritage Homes Corp.*, 37 F. Supp. 3d 860, 868 (S.D. Tex. 2014) ("Although portions of [Plaintiffs'] testimony are contradicted in some respects by [their] time records, whether those inconsistencies discredit all of [their] attestations is a credibility issue for the factfinder. [Their] reported time records, coupled with [their] testimony and documentary evidence, are enough for a jury to find that there were weeks when [they] worked unpaid overtime hours." (footnote omitted)). I believe it is appropriate to let a jury hear the evidence and make the ultimate factual determination.

### 3. *Whether Plaintiffs' Man-Day Bonuses Are Included in Their Regular Rate of Pay*

The parties have presented conflicting evidence as to whether Plaintiffs' man-day bonuses were discretionary and, therefore, not included in their regular rate of pay. For example, Beast Energy points to what it contends is its written bonus policy—which appears in its employee handbook—that states that "[i]ncentive bonuses may be awarded depending on the [company's] overall profitability." Dkt. 44-1 at 9. Beast Energy also directs me to its model at-will employment agreement—which it admits neither Wimberley nor Flores signed—that similarly provides: "Payment of any bonuses shall be at the complete discretion of the corporation." *See id.* at 4, 12.

Plaintiffs, on the other hand, direct me to Tyson's testimony that he "had the authority on behalf of [Beast Energy] to offer" man-day bonus payments, which he verbally promised to Wimberley and Flores. *See* Dkt. 45-2 at 6–7. Tyson also testified that, while Best Energy "had some discretion over the fact of payment . . . . [t]he amount and predetermined formula/calculation of the bonuses were not discretionary." *Id.* at 7. Wimberley's offer letter[7] supports both theories, as it states that he was eligible to receive a monthly performance bonus equal to 50% of his signed field tickets from the previous month (i.e., a predetermined formula); however, it also provides that the bonus payment was "subject to [Beast Energy's] bonus program." *Id.* at 10.

On this record, I find that an issue of material fact exists. Accordingly, "[t]he jury, rather than the Court, must resolve this contradictory evidence concerning the discretionary nature of [Plaintiffs'] bonuses." *Galvan v. FTS Int'l Servs., LLC*, No. 7:16CV147-LG-DC, 2017 WL 3012651, at *2 (W.D. Tex. June 7, 2017).

## ADMONITION

It took an inordinate amount of time to unravel the tangled skein that is Plaintiffs' briefing because, inexplicably, Plaintiffs failed to cite to specific portions of the summary-judgment record. Instead, Plaintiffs make generalized statements while

---

[7] If Flores received an offer letter from Beast Energy, it is not part of the record.

citing an entire exhibit as the source. By my count, Plaintiffs' counsel committed this offense an impressive **82** times.

The Court relies on counsel to provide briefs with developed and focused arguments supported by citation to and application of legal authority to help it ultimately reach the correct decision. In the same vein, the Court relies on counsel to provide competent record citations. It is wholly insufficient for a party to cite to the record in the most skeletal way, leaving the Court to conduct an open-ended review of each cited document to determine whether it might contain evidence supporting the party's arguments. This is an incredible waste of valuable—not to mention, finite—judicial resources.

## CONCLUSION

For the foregoing reasons, I recommend that the Court **DENY** Beast Energy Service, Inc.'s Motion for Summary Judgment (Dkt. 44), **DENY** Beast Energy Service, Inc.'s Motion to Strike (Dkt. 47), and **DISMISS WITHOUT PREJUDICE** Plaintiffs' claims against Defendant Stig Gjerlaug for failure to prosecute.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED this 4 day of March 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE